# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

VIRGINIA COLE, individually and on behalf of all others similarly situated,

        Plaintiff,

    v.

CASH BY PHONE, LLC,

        Defendant.

No. 3:26-cv-00361

CLASS ACTION

JUDGE RICHARDSON
MAGISTRATE JUDGE FRENSLEY
JURY TRIAL DEMANDED

## DEFENDANT'S MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS PLAINTIFF'S COMPLAINT AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF

## INTRODUCTION

In her Complaint (Dkt. 1), Plaintiff Virginia Cole claims that Defendant Cash By Phone, LLC ("CBP") violated certain "Do Not Call" ("DNC") provisions of the Telephone Consumer Protection Act ("TCPA"). In particular, she asserts that CBP violated one of the TCPA's implementing DNC regulations (*i.e.*, 47 C.F.R. § 64.1200(c)) promulgated under Section 227(c) of the TCPA (*i.e.*, 47 U.S.C. § 227(c)(5)), which on its face affords a private cause of action only for "telephone calls" made to certain numbers properly listed on the National DNC Registry. Plaintiff, however, bases her DNC claim entirely on text messages that she conclusorily alleges that CBP "delivered, or caused to be delivered" by third parties to her purportedly DNC-registered cell number without her consent.

While these allegations do not state a legally cognizable or plausible claim, this Court is not the proper forum to make such determinations. That is because, contrary to what she alleges, not only did Plaintiff consent to receiving the subject texts through an online consent form on an affiliated corporate entity's website, but in doing so she also agreed <u>twice</u> to abide by certain terms and conditions, including that she arbitrate any claims against CBP strictly on an individual basis. *See* Declaration of Andrew Buser ("Buser Decl."), attached hereto as Ex. 1, at ¶¶ 7-11 and Ex. G at pp. 1, 6. Through this motion, CBP primarily seeks to compel Plaintiff to honor that agreement.

As demonstrated below, federal district courts nationwide have consistently enforced broad online arbitration agreements, like the one to which Plaintiff agreed here, in accordance with the strong federal policy favoring arbitrations under the Federal Arbitration Act (*i.e.*, 9 U.S.C. § 1, *et seq*., the "FAA"). Moreover, in the arbitration agreement at issue here, the parties clearly and unmistakably agreed to delegate all questions of arbitrability to the arbitrator to decide. Thus, once the Court determines the parties entered into a binding arbitration agreement, its work is done; and the FAA and binding federal precedent mandates that this matter be referred to arbitration and stayed.

1

Should the Court not compel arbitration, however, Plaintiff's Complaint cannot withstand scrutiny under Fed. R. Civ. P. 12(b)(6) for several reasons. For one, while it lacks plausible facts, its primary defect is legal. In this regard, numerous district courts (including in this Circuit) have done a thorough analysis of the applicable TCPA provision that Plaintiff invokes for her claim here and have correctly concluded that the private cause of action afforded under Section 227(c)(5) can <u>only</u> be invoked for unlawful "telephone calls" and not just for any form of telephonic communication, such as text messages. *See, e.g., Stockdale v. Skymount Property Group, LLC*, 2026 WL 591842, at *2-3 (N.D. Ohio Mar. 3, 2026) ("[T]his Court joins several others in holding that the term 'telephone call' as used in Section 227(c)(5) of the TCPA does not encompass 'text messages.'") (collecting cases). As Plaintiff's only claim rests entirely on alleged texts, it fails as a matter of law.

Even if *arguendo* Plaintiff had pled a legally cognizable TCPA claim (and she did not), her Complaint lacks sufficient plausible facts supporting certain essential elements of her asserted DNC claim—including *inter alia* that (i) she qualifies as a "residential telephone subscriber" within the meaning of the TCPA, (ii) she received an actionable "telephone solicitation" as defined by the TCPA's DNC regulations, or (iii) she registered the subject phone number on the DNC Registry, as the plain language of the statutory text requires. Should the Court reach these merits-based issues, therefore, Plaintiff's entire Complaint should nevertheless be dismissed under Rule 12(b)(6).

<u>**RELEVANT FACTUAL BACKGROUND AND PLED ALLEGATIONS**</u>

On March 8, 2025, Plaintiff visited a CBP affiliate's website, www.lendingforbadcredit.com (hereafter, the "Website"), for the ostensible purpose of obtaining additional information from CBP about loans. *See* Buser Decl., ¶¶ 7-11. When doing so, Plaintiff completed various forms. *Id*. ¶¶ 9-10 & Exs. D, E and F thereto. On one form she completed, Plaintiff consented to receiving text messages and other communications from or on behalf of CBP on her cell phone number (the same

2

number at issue in her Complaint). *Id*. ¶ 10 & Ex. E thereto. On two other forms, Plaintiff entered into a valid and binding arbitration agreement with CBP. *Id*. ¶ 10 & Exs. D and F thereto. Both of those forms clearly indicated that, by completing and clicking the button on the form (either "Next" or "View Offers"), Plaintiff was agreeing to abide by certain terms and conditions, including *inter alia*, the "Terms of Service" and "Arbitration Notice." *Id*. The underlined text on these forms was in a blue font, denoting hyperlinks. *Id*. Plaintiff completed the forms and clicked on the buttons. *Id.*

The aforementioned hyperlinked "Terms of Service" (hereafter, "Terms") stated at the top in bold capitalized letters: "**ARBITRATION NOTICE: THESE TERMS OF SERVICE CONTAIN AN ARBITRATION CLAUSE. SEE DISPUTE RESOLUTION; GOVERNING LAW BELOW FOR DETAILS**." *Id*., Ex. G, p. 1. The referenced "Dispute Resolution" section of the Terms, which is separately hyperlinked on the forms as the "Arbitration Notice,"[1] contains a broadly worded arbitration agreement (hereafter, the "Arbitration Agreement") stating in pertinent part:

> You agree that: (1) ***Any claim, dispute, or controversy*** (whether in contract, tort, or otherwise) between you and Search ROI, LLC [CBP's corporate affiliate], along with any of its present and future marketing contractors, ***marketing affiliates,*** lead buyers, assignees, or ***other individuals or entities who may contact you in connection with the [W]ebsite*** [*i.e*., CBP] or the services provided on the website (the "Search ROI, LLC Parties"), and ***arising out of, relating to, or connected in any way with the website or the services provided on the website will be resolved exclusively by final and binding arbitration conducted pursuant to the American Arbitration Association ("AAA") Consumer Arbitration Rules*** (if and as applicable depending on the amount in controversy); (2) This arbitration agreement is made pursuant to a transaction governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16; (3) The arbitration will be held in your county of residence; []; (6) ***There will be no authority for any claims to be arbitrated on a class or representative basis***….

*Id*., p. 6 (all emphases added). The Arbitration Agreement further states, in bold capitalized letters:

"**THESE TERMS PROVIDE THAT ALL DISPUTES BETWEEN YOU AND THE SEARCH ROI, LLC PARTIES WILL BE RESOLVED BY BINDING ARBITRATION. THUS, YOU GIVE UP YOUR RIGHT TO GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS.**

---

[1] Clicking the "Arbitration Notice" link takes users directly to that section of the Terms. *Id*. ¶ 10.

**YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN OR BRING CLASS ACTIONS**." *Id.* It also contains an express delegation clause, stating that "[a]ny dispute as to arbitrability, including disputes about this Agreement's enforceability, unconscionability, waiver, validity and applicability must be resolved by the arbitrator in arbitration and not by the court." *Id.*

Despite the foregoing, Plaintiff commenced this putative class action against CBP on March 27, 2026. *See generally* Dkt. 1. She claims that "Defendant delivered, or caused to be delivered, at least seven **text messages**" without her consent to the Subject Number—which she claims is her "personal residential telephone number" and has purportedly "been registered on the [National] DNC Registry since May 15, 2024" —between "March 8 to March 14, 2026 [*sic*]." *Id.*, ¶¶ 11, 12, 14, 16 (emphasis added).[2] Plaintiff does not allege that she received any "telephone calls" from CBP.

<u>ARGUMENT</u>

Plaintiff indisputably entered into a valid and binding individual Arbitration Agreement with CBP when she visited the Website and agreed to the Terms. Plaintiff should therefore be compelled to honor that agreement. But if the Court does not compel her to arbitrate, her ill-pled TCPA claim lacks merit for several reasons and should nevertheless be dismissed under Rule 12(b)(6).

**I.      <u>Plaintiff Should Be Compelled to Arbitrate Her Underlying Claim.</u>**

The FAA "requires courts to enforce the bargain of the parties to arbitrate" and "leaves no place for the exercise of discretion by a district court…." *KPMG LLP v. Cocchi,* 565 U.S. 18, 21-22 (2011). The Supreme Court has also made clear that arbitration agreements must be enforced as written pursuant to the FAA. *See, e.g., AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011). As such, this Court's role in ruling on a motion to compel arbitration is generally limited to

---

[2] In reality, the subject texts were transmitted in 20<u>25</u>. *See* Buser Decl., ¶ 12. Plaintiff opted-out of receiving texts on March 14, 2025, but not the Arbitration Agreement. *See id.* & Ex. A thereto.

4

determining whether the parties agreed to arbitrate the claims at issue, and not to consider the merits of the claim. *See AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649–50 (1986).

Accordingly, courts in the Sixth Circuit generally apply a four-part test to determine whether to grant a motion to compel arbitration:

> "'[F]irst, [a court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.'"

*Adler v. Am. Express Co.,* 2025 WL 904462, at *3 (N.D. Ohio Mar. 25, 2025) (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)) (TCPA case). If a district court concludes that there is a valid agreement to arbitrate and the matter falls within the scope of that agreement, the FAA mandates that the case ***must*** be referred to arbitration and stayed. *See* 9 U.S.C. §§ 3-4; *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Further, the party challenging arbitration (here, Plaintiff) bears the burden of proving that the arbitration provision at issue is unenforceable. *Adler,* 2025 WL 904462, at *3 (citing, *inter alia*, *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000)).[3] And generally, doubts concerning arbitrability are to be resolved in favor of arbitration. *See Burden v. Check Into Cash of Ky., LLC*, 267 F.3d 483, 488 (6th Cir. 2001). *See also Glazer v. Lehman Bros.,* 394 F.3d 444, 450 (6th Cir. 2005) ("[T]here is a strong presumption in favor of arbitration under the FAA."). As shown below, Plaintiff cannot meet this burden here.

### A. A Valid and Binding Arbitration Agreement Exists Between the Parties.

The existence of a valid arbitration agreement is a threshold matter that must be established before the FAA can be invoked to enforce it. *See, e.g., Adler* 2025 WL 904462, at *3 (citing *Fazio v.*

---

[3] In this Circuit, "[m]otions to compel arbitration are treated like motions for summary judgment." *Id.* (citing *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002)).

*Lehman Bros*., Inc., 340 F.3d 386, 393 (6th Cir. 2003)); *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1193 (2024); *In re StockX Cust. Data Sec. Breach Litig*., 19 F.4th 873, 879–80 (6th Cir. 2021). To make this determination, federal courts generally apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944 (1995). *See also Morrison v. Circuit City Stores,* 317 F.3d 646, 666 (6th Cir. 2003) (federal courts "review the enforceability of an arbitration agreement according to the applicable state law of contract formation"). Under Tennessee law, as is common everywhere else, contract formation generally requires, *inter alia*, "mutual assent" between the parties. *Roberts v. Boyd Sports, LLC*, 712 F. Supp. 3d 1062, 1066 (E.D. Tenn. 2024) (citing *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co*., 160 S.W.3d 521, 524 (Tenn. 2005)) (discussing state contract law principles). Such "mutual assent need not be manifested in writing," but instead "may be manifested, in whole or in part, by the parties' spoken words or by their actions or inactions." *Burton v. Warren Farmers Co-op*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002) (citing *Cole-McIntyre-Norfleet Co. v. Holloway*, 141 Tenn. 679, 214 S.W. 817, 818 (1919)); *see also Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007) ("The parties' actions or inactions, as well as spoken words, can establish mutual assent.").[4] Whether Plaintiff actually read the Terms is immaterial to whether a valid and enforceable contract was formed here. *See, e.g., Merritt v. Square Cap., LLC,* 2024 WL 4183316, at *6, n.7 (W.D. Tenn. July 25, 2024), *report and rec. adopted,* 2025 WL 842247 (Mar. 18, 2025).

Consistent with the long-standing strong federal policy in favor of arbitration, however, an arbitration agreement governed by the FAA is generally ***presumed*** to be valid and enforceable. *See, e.g., Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Glazer,* 394 F.3d at 450.

---

[4] The same is true under Kansas law, which the Terms provide as the applicable law governing the parties' Arbitration Agreement. *See* Buser Decl., Ex. G at p. 6; *Williams v. Allstate Claims Off.,* 2022 WL 138409, at *3 (D. Kan. Jan. 14, 2022) (citing *Steele v. Harrison,* 552 P.2d 957, 962 (Kan. 1976) and *Sw. & Assocs., Inc. v. Steven Enters.*, 88 P.3d 1246, 1249 (Kan. Ct. App. 2004)).

6

Accordingly, while CBP bears the initial evidentiary burden to show the existence of an arbitration agreement between the parties in this case, this is not a particularly high hurdle for it to clear. Rather, CBP merely bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *See, e.g., Johnson v. Long John Silver's Restaurants, Inc.*, 320 F. Supp. 2d 656, 664 (M.D. Tenn. 2004), *aff'd*, 414 F.3d 583 (6th Cir. 2005); *Denton v. Allenbrooke Nursing & Rehab. Ctr., LLC*, 495 F. Supp. 3d 601, 610 (W.D. Tenn. 2020).

In contrast, Plaintiff cannot rely on mere denials to meet her burden of proof here and must provide evidence to support a valid contract formation challenge. *See, e.g., Nealey v. Heritage Oaks Mgmt. Enterprises USA, LLC*, 2020 WL 2507332, at *3 (S.D. Ohio May 15, 2020) (plaintiff's "self-serving statements" in an affidavit was deemed "insufficient to raise a question of material fact regarding the validity of the arbitration agreement" alone); *Anderson v. Crothall Healthcare Inc.*, 2022 WL 3719834, at *4–5 (E.D. Mich. Aug. 29, 2022) (noting "[o]ther courts have rejected a party's own assertion, without evidentiary support, as sufficient to create a genuine issue of material fact" for a motion to compel arbitration "when the evidence shows otherwise") (collecting cases).

Further, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). *See also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) ("[C]licking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket. In both cases, the consumer is prompted to examine terms of sale that are located somewhere else. Whether or not the consumer bothers to look is irrelevant."). Along those lines, courts have uniformly recognized that "[a]ny reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider." *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 278 (E.D.N.Y. 2019), *aff'd*, 815

7

F. App'x 612 (2d Cir. 2020) (quoting *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at \*5 (D.D.C. Nov. 1, 2016)). *See also Mellen v. Dalton*, 2022 WL 22996680, at \*6 (W.D. Mich. Apr. 11, 2022) (citing, *inter alia, Nicosia* and *Nguyen* with approval). As to online agreements to arbitrate in particular, courts have recognized two main types: (1) "clickwrap" agreements, whereby "a website user clicks a button or checks a box that explicitly affirms that the user has accepted the terms after having the opportunity to scroll through the terms posted on the website" and (2) "browsewrap" agreements, whereby the terms and conditions are linked somewhere on the website but the user does not have to click anything to proceed. *Miracle-Pond v. Shutterfly, Inc.,* 2020 WL 2513099, at \*4 (N.D. Ill. May 15, 2020) (citing various cases). *See also Shirley v. Rocket Mortg.,* 2022 WL 2541123, at \*4 (E.D. Mich. July 7, 2022) (discussing types of online agreements) (citing *Maree v. Deutsche Lufthansa AG*, 2021 WL 267853 at \*3 (C.D. Cal. Jan 26, 2021)). Courts in and beyond the Sixth Circuit "have routinely found 'clickwrap' agreements"—like the one at issue in this case— "enforceable." *Shirley*, 2022 WL 2541123, at \*4 (citations omitted). So should this Court.

In this case, the evidence shows that Plaintiff was presented with and voluntarily assented to the hyperlinked Terms, and did so <u>twice</u>, via-a-vis a standard online "clickwrap" agreement that countless other courts have enforced in TCPA and other cases. In summary, Plaintiff (i) completed the relevant forms on the subject Website and clicked the operative button on each form to signify her assent to the Terms, (ii) was placed on notice of the existence of the Arbitration Agreement several times throughout the process, including on the webforms she completed and in the Terms, and (iii) had the opportunity to review the Terms and Arbitration Agreement within if she desired, which were conspicuously presented to Plaintiff in plain English and not complex "legalese." *See* Buser Decl., ¶¶ 7-11 & Exs. A-F & Ex. G at pp. 1, 6. The Terms also gave Plaintiff the option to opt-out of the Arbitration Agreement if she desired, which she apparently never exercised. *Id.*, ¶ 12.

At bottom, because the subject Website "'contained a clear and conspicuous statement that ... a user agreed to the [hyperlinked] Terms'" by pressing the buttons on the forms, the Court should rule that "a reasonable user who completes that process would understand that she was manifesting assent to the Terms" and to the Arbitration Agreement contained therein, and thus that the subject Arbitration Agreement constitutes a valid and enforceable contract between the parties in this case. *Miracle-Pond,* 2020 WL 2513099, at \*4 (quoting *Johnson v. Uber Techs., Inc*., 2018 WL 4503938, at \*4-5 (N.D. Ill. Sep. 20, 2018)) (enforcing similar clickwrap agreement in TCPA case).[5]

### B. All Arbitrability Issues Have Been Delegated Solely to the Arbitrator.

At this point, the Court need not rule any further, and should refer this case to arbitration and stay it, as all arbitrability challenges have been delegated to the arbitrator (not this Court) to decide.

Under the FAA, parties can agree in their contracts "to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). Where, as here, there is "clear and unmistakable" evidence that the parties have delegated all arbitrability

---

[5] While CBP is a direct party to the Arbitration Agreement (*see* Buser Decl., Ex. D thereto), it is well-accepted that an obligation to arbitrate does not attach only to the direct parties to the agreement. *See, e.g., Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 630 (2009) (holding that the enforceability of arbitration agreements can extend beyond "disputes between parties to a written arbitration agreement...[i]f a written arbitration provision is made enforceable against (or for the benefit of) a third party under state contract law."). Here, the Arbitration Agreement states that it covers disputes between Plaintiff "and Search ROI, LLC (which is CBP's corporate affiliate) "along with any of its present and future marketing contractors, marketing affiliates, lead buyers, assignees, or other individuals or entities who may contact you in connection with the [W]ebsite," which includes CBP. *See* Buser Decl., Ex. G at p. 6. Thus, CBP is at least a third party beneficiary to the Arbitration Agreement. Regardless, courts have widely found that whether a movant has standing to enforce an arbitration agreement against a signatory is ***in and of itself*** a delegable arbitrability issue. *See, e.g., Becker v. Delek US Energy, Inc.,* 39 F.4th 351, 355–56 (6th Cir. 2022) (holding that the question of non-signatory's ability to enforce agreement is one of "enforceability, not existence" and is distinct from formation question); *see also Miller v. Travel Guard Grp., Inc.,* 2022 WL 2712507, at \*1 (N.D. Cal. July 13, 2022); *Intuniv Antitrust Litig.*, 2021 WL 517386, at \*3-8 (D. Mass. Feb. 11, 2021) (citing, *inter alia*, *Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 473-74 (1st Cir. 1989)); *Eckert/Wordell Architects, Inc. v. FJM Props.,* 756 F.3d 1098, 1100 (8th Cir. 2014). Given that all arbitrability issues have been delegated here, as discussed below, this Court need not consider this issue.

9

issues to the arbitrator to decide, federal law requires that the agreement be enforced; and at that point the court "may not override the contract" and "possesses no power to decide the arbitrability issue"—even if the court "thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68-70 (2019). Put differently, "when the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract" and order the parties to submit the case to arbitration, once it finds a valid contract exists. *Id.* at 65.

As applied here, the subject Arbitration Agreement expressly states that "*[a]ny dispute as to arbitrability*, *including disputes about this Agreement's enforceability, unconscionability, waiver, validity and applicability must be resolved by the arbitrator in arbitration and not by the court*." *See* Buser Decl., Ex. G thereto at p. 6. This is a classic example of an express delegation clause and thus there can be no question that all arbitrability issues have been delegated solely to the arbitrator to decide in this instance. *See also Patrick v. Comcast Cable Commc'ns, LLC*, 2021 WL 75770, at *3 (S.D. Tex. Jan. 8, 2021) (compelling arbitration in TCPA case and holding: "'If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases.'") (quoting *Edwards v. Doordash, Inc.,* 888 F.3d 738, 744 (5th Cir. 2018) (citation omitted)).

Moreover, the Terms' express reference to "American Arbitration Association ('AAA') Consumer Arbitration Rules" (hereafter, the "AAA Rules") provides further support for the delegation of this threshold question to the arbitrator. *See* Buser Decl., Ex. G at p. 6. In this regard, courts have consistently held that incorporation of the AAA Rules into an agreement alone serves as "clear and unmistakable" evidence of the parties' intent" to delegate all arbitrability disputes to the arbitrator. *See, e.g., Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 846 (6th Cir. 2020), *cert. denied sub nom.* 141 S. Ct. 1268 (2021) ("[D]istrict courts in our circuit have long found that

10

the incorporation of the AAA Rules provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.' [ ] Just another persuasive reason for us to do the same.") (internal citations omitted)); *In re StockX Customer Data Sec. Breach Litig.,* 19 F.4th at 879 (ruling similarly). As all arbitrability issues have been delegated, the Court's work on this motion is done.

### C. The Arbitration Agreement is Enforceable Under the FAA, and Plaintiff's Underlying TCPA Claim is Within Its Facially Broad Scope.

Should the Court reach the question of arbitrability anyway despite it having been delegated to the arbitrator (and it should not), the answer favors enforcement of the Arbitration Agreement.

Arbitration agreements subject to the FAA's requirements must only be a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. The Supreme Court has held the term "involving commerce" as used in the FAA is "the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc*., 539 U.S. 52, 56 (2002). Thus, the FAA is extremely broad and applies to any transaction possibly ***directly or indirectly*** affecting interstate commerce in some way. *See, e.g., Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 (1967).

Here, the Arbitration Agreement at issue expressly states that "[t]his arbitration agreement is made pursuant to a transaction governed by the Federal Arbitration Act ('FAA'), 9 U.S.C. §§ 1-16." *See* Buser Decl., Ex. G thereto at p. 6. Moreover, Plaintiff alleges that she is a Tennessee resident and that the subject texts were sent to Tennessee. *See* Dkt. 1, ¶¶ 5, 6. In contrast, she alleges that CBP is a limited liability company headquartered in Kansas (*id*. ¶ 7); and it conducts business nationwide. *See* Buser Decl., ¶ 7. Therefore, the FAA unquestionably applies to the Arbitration Agreement.

The Arbitration Agreement is also enforceable under the FAA, which provides arbitration provisions in "a contract evidencing a transaction involving commerce … shall be valid, irrevocable,

11

and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Accordingly, "Congress has instructed federal courts to enforce arbitration agreements according to their terms." *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1619 (2018); *see also Concepcion*, 563 U.S. at 344 (ruling similarly); *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985) (courts must "rigorously enforce agreements to arbitrate"). Therefore, if a court finds a valid agreement to arbitrate exists and that it encompasses the dispute, as is true here, then the FAA ***requires*** the matter be referred to arbitration. *Dean Witter,* 470 U.S. at 218.

As discussed at length above, there can be no debate that a valid and enforceable arbitration was formed and exists between the parties here. *See* discussion at pp. 5-9, *supra*. Moreover, the Supreme Court has made clear that all arbitration agreements must be analyzed against the backdrop of the FAA, which reflects a "liberal federal policy favoring arbitration." *Concepcion*, 563 U.S. at 339, 344 (internal quotations omitted).[6] Per the Supreme Court, Congress enacted the FAA "to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." *Green Tree Fin. Corp.-Ala.*, 531 U.S. at 89 (internal quotation and alteration omitted). As such, the FAA leaves no place for discretion by a district court, and instead mandates that they direct parties to proceed to arbitration on all issues subject to their agreement. *See Dean Witter,* 470 U.S. at 221. Further consistent with the foregoing principles, it is axiomatic that "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses*, 460 U.S. at 24-25. *See also Huffman v. Hilltop Companies, LLC*, 747 F. 3d 391, 395 (6th Cir. 2014) ("[W]ith respect to agreements containing broadly-worded arbitration clauses, 'there is a presumption of arbitrability in the sense that an order to arbitrate the

---

[6] *See also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *Marmet Health Care Ctr., Inc. v. Brown,* 565 U.S. 530, 533 (2012) (discussing the same liberal federal policy).

particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'") (quoting *Litton Financial Printing Division, Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 209 (1991), with other citations omitted).

Here, Plaintiff cannot evade her contractual obligation to proceed with "any" claims or dispute with CBP in the arbitral forum on the grounds that her TCPA claim is outside the scope of the Arbitration Agreement. Indeed, the Arbitration Agreement broadly covers "***[a]ny claim, dispute, or controversy (whether in contract, tort, or otherwise)*** between you and [CBP's affiliate], along with any of its present and future marketing contractors, marketing affiliates, lead buyers, assignees, or other individuals or entities who may contact you in connection with the website [*i.e.*, CBP] or the services provided on the website [] ***and arising out of, relating to, or connected in any way with the website or the services provided on the website.***" Buser Decl., Ex. G at p. 6 (all emphases added).

Courts have found that the scope of such an arbitration agreement is broad enough to cover virtually all possible disputes imaginable between the contracting parties, including TCPA claims in particular, which are indisputably arbitrable. *See, e.g., Whaley v. T-Mobile, USA, Inc.,* 2013 WL 5155342, at *2 (E.D. Ky. Sept. 12, 2013) (enforcing agreement in TCPA case covering "any and all claims or disputes in any way related to ... the agreement, [T–Mobile's] services, devices or products" and holding: "Similar clauses calling for arbitration of disputes relating to an agreement have been deemed to be broadly written.") (collecting cases); *Adler* 2025 WL 904462, at *1, 3, 5 (enforcing arbitration agreement in TCPA case covering "any current or future claim, dispute or controversy relating to your Account(s), this Agreement, or any agreement or relationship you have or had with us"); *Sapan v. Directv, LLC*, 2023 WL 5505914, at *6 (C.D. Cal. June 9, 2023) (compelling arbitration of TCPA claims where internet services agreement provided that "all claims" are subject

13

to arbitration); *Lozada v. Progressive Leasing d/b/a Prog Leasing LLC,* 2016 WL 3620756, at \*3 (E.D.N.Y. June 28, 2016) (enforcing arbitration agreement applying to "any claim, dispute or controversy ... that arises from or relates in any way to this Lease" in a TCPA case, noting the "defendant's alleged phone calls 'relate to' the Lease because plaintiff's alleged damages would not have been suffered had plaintiff never entered into the Lease") (collecting similar TCPA and other cases); *Johnson,* 2018 WL 4503938, at \*1–6 (compelling arbitration in putative TCPA class action where the arbitration provisions at issue were likewise presented via a clickwrap agreement and similarly broadly worded to cover "any dispute … arising out of or relating to" the agreement); *Shea v. BBVA Compass Bancshares, Inc*., 2013 WL 869526, at \*5 (S.D. Fla. Mar. 7, 2013) (holding TCPA claim was within scope of arbitration provision covering *inter alia* "a dispute, claim or controversy of any kind aris[ing] out of or relat[ing] to this Agreement," where "Defendant alleges that it had prior consent to send a text message to Plaintiff"). *See also Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc*., 350 F.3d 568, 577 (6th Cir. 2003) ("[O]nly an express provision excluding a specific dispute, or 'the most forceful evidence of a purpose to exclude the claim from arbitration,' will remove the dispute from consideration by the arbitrators."). So should this Court.

### D. Plaintiff's Claim Must Be Arbitrated Strictly on an Individual Basis.

Although Plaintiff seeks class treatment in her Complaint, the Arbitration Agreement makes clear that any arbitration must proceed only on an individual basis and that Plaintiff is waiving her class action rights. *See* Buser Decl., Ex. G p. 6 As the Supreme Court has held, "Congress has instructed federal courts to enforce arbitration agreements according to their terms—***including terms providing for individualized proceedings***." *Epic Sys. Corp.*, 138 S.Ct. at 1619 (emphasis added). Thus, it is well-settled that such class action waivers in arbitration agreements like the one here are enforceable. *See, e.g., Concepcion*, 563 U.S. at 352; *Am. Express Co. v. Italian Colors Rest.*, 133

14

S.Ct. 2304 (2013); *DIRECTV, Inc. v. Imburgia*, 136 S.Ct. 463, 471 (2015). Therefore, the Court should order Plaintiff to submit her TCPA claim to an individual arbitration, as she agreed to do.

### E. The FAA Mandates That This Matter Be Stayed Pending Arbitration.

Lastly, the FAA requires a stay of this action in favor of an individual arbitration. *See Smith*, 601 U.S. at 478 ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.") (citing 9 U.S.C. § 3). *See also Ramirez v. Equifax Info. Servs., LLC,* 2024 WL 3259669, at \*2 (E.D. Tex. July 1, 2024) (also staying discovery deadlines during pendency of motion to compel arbitration, noting that "if a stay is not entered, [defendant] faces the burden of discovery in federal court and loses the potential advantage of less intrusive discovery pursuant to the purported arbitration agreement" and the risk of prejudice to plaintiff as a result of the stay was minimal). Consequently, this matter should be referred to arbitration and stayed now, both during the pendency of this motion as well as during and until the conclusion of the arbitration proceedings.

### II. Alternatively, Plaintiff's Entire Complaint Should Be Dismissed Under Rule 12(b)(6).

If the Court does not compel arbitration, as it should, Plaintiff's entire Complaint is legally and facially deficient and ripe for dismissal under Rule 12(b)(6)[7] for several reasons, as shown below.

### A. Plaintiff's Claim Fails Because Section 227(c) of the TCPA Does Not Cover Texts.

As a threshold issue, Plaintiff's text-based DNC claims fail as a matter of law, and thus should be dismissed under Rule 12(b)(6), because Section 227(c) of the TCPA provides a private right of action *only* to "[a] person who has received more than one *telephone call* within any 12-month period by one on behalf of the same entity in violation of the regulations prescribed under this

---

[7] Local page limits do not permit CBP to provide the applicable Rule 12(b)(6) standards in this motion, of which this Court is undoubtedly familiar and are well-reflected in the opinions below.

subsection." 47 U.S.C. § 227(c)(5) (emphasis added). As several courts have observed, Section 227(c), which has existed since the statute's enactment, "does not mention text messages or SMS messages, and nowhere does the TCPA define 'telephone call' to include text and/or SMS messages." *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894, 904 (C.D. Ill. 2025), *appeal filed sub nom.,* No. 25-2398 (7th Cir., Aug. 12, 2025) (dismissing); *see also Davis v. CVS Pharm., Inc.*, 797 F. Supp. 3d 1270, 1272-1273 (N.D. Fla. 2025) (dismissing **with prejudice** on this basis). In other words, these courts and many others have found that "[t]he statutory text here is clear that only telephone calls are actionable under § 227(c)(5), not text messages." *Radvansky v. 1-800-FLOWERS.COM, Inc.,* 2026 WL 456919, at *3 (N.D. Ga. Feb. 17, 2026) (dismissing on this basis).[8]

Moreover, as the U.S. Supreme Court recently reiterated, "[e]very statute's meaning is *fixed at the time of enactment*." *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 400 (2024) (emphasis added). This means that federal courts "must interpret what Congress wrote" when Section 227(c) was enacted in 1991, and they cannot rewrite it to update it for modern technology. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 405, 409 (2021). And it is axiomatic that if a statute's language is plain and unambiguous—like the TCPA's text certainly is—courts need not analyze it further and "must enforce it according to its terms." *King v. Burwell,* 135 S.Ct. 2480, 2489 (2015). *See also Stockdale*, 2026 WL 591842, at *4 ("***Where, as here, the language of the statute is clear, the Court's analysis stops***.") (citing *U.S. v. Choice,* 201 F.3d 837, 840 (6th Cir. 2000)) (emphasis added).

Courts applying these core principles have, therefore, concluded that texts are not covered by the plain language of Section 227(c) because "[t]ext messaging was not an available technology

---

[8] *See also Stockdale*, 2026 WL 591842, at *2-3; *El-Sayed v. Naturopathica Holistic Health, Inc.*, 2025 WL 2997759, at *2 (M.D. Fla. Oct. 24, 2025); *James v. Smarter Contact, Inc.,* 2026 WL 879244, at *3-5 (M.D. Fla. Mar. 31, 2026); *Irvin v. Sonic Indust. Serv., LLC*, 2026 WL 1098403, at *2–5 (N.D. Ga. Apr. 20, 2026); *Richards v. Fashion Nova, LLC*, 2026 WL 847568, at *2-4 (S.D. Ind. Mar. 26, 2026); *Richards v. Shein Distrib. Corp.*, 2026 WL 847584, at *3 (S.D. Ind. Mar. 26, 2026) (each ruling similarly and dismissing DNC claims under Rule 12(b)(6) on this basis).

16

in 1991, and thus 'telephone call' would not have included text messages or SMS messages." *Jones*, 792 F.Supp.3d at 899 (citing https://time.com/3612277/text-message-history-future/ ("The world's very first text message, sent Dec. 3, 1992…."")); *see also Davis*, 797 F.Supp.3d at 1273 (ruling similarly); *Stockdale*, 2026 WL 591842, at *3 (same). In short, "under a plain reading, Section 227(c)(5) … does not regulate text messages." *Jones*, 792 F.Supp.3d at 899.

As applied here, because "Plaintiff pled only that [CBP] violated 47 U.S.C. § 227(c)(5) through sending text messages in violation of 47 C.F.R. § 64.1200(c)," her Complaint "fails as a matter of law" and must be dismissed under Rule 12(b)(6). *Radvansky* 2026 WL 456919 at *5.

In response to this Motion, Plaintiff may invite this Court to expand the plain language of Section 227(c) to cover <u>all</u> communications to or from a phone. The Court should decline this invitation, as doing so would violate the settled statutory construction principles discussed above and stretch the statute far beyond Congress' express limits. *See Radvansky,* 2026 WL 456919 at *4 (rejecting similar invitation). Indeed, a comprehensive review of the statute's history, plain language, and overall structure confirms that Congress did <u>not</u> employ language suggesting the term "telephone call" used in Section 227(c) would serve as a catchall for any present or future phone technology.

*First*, Congress has amended the TCPA multiple times since its enactment but has <u>never</u> amended Section 227(c) to include texts. In 2018, for example, Congress amended the statute to address text messages in connection with Caller ID requirements, which fall under a different provision of the statute. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. P, § 503(a) (codified at 47 U.S.C. § 227(e)). In doing so, Congress expressly distinguished between "a call made using a voice service" and "a text message sent using a text messaging service." 47 U.S.C. § 227(e)(8)(A), (B). As the *Radvansky* court observed, "[t]his distinction" shows that "Congress intended § 227(c)(5) to encompass only telephone calls" and not texts. 2026 WL 456919, at *4.

17

The foregoing amendment demonstrates three critical points here: (1) Congress knows how to differentiate between technologies when legislating in this space; (2) it did not just assume that texts were already covered by the TCPA's reference to "telephone calls" (or else there would have been no need to amend Section 227(e) to include them); and (3) it did not intend every provision of the TCPA (which function independently from each other[9]) to sweep in texts. *See also El-Sayed,* 2025 WL 2997759, at *2 ("In addition to the fact that in common American English usage, a 'telephone call' and a 'text message' are separate and distinct forms of communication, the term 'text message' appears elsewhere in the TCPA and related amendments, an appearance that confirms Congress understood the pertinent distinction and legislated mindful of the distinction."). *See also Radvansky*, 2026 WL 456919, at *4 (ruling similarly).[10] Expanding "telephone call" in Section 227(c) to encompass every form of communication transmitted to or from a phone would not only depart from the statute's plain and unambiguous text, which is dispositive on this issue, but it also "would likely more than double the number of private causes of action authorized by the TCPA." *McGonigle v. Pure Green Franchise Corp.*, 2026 WL 111338, at *2 (S.D. Fla. Jan. 15, 2026).

*Second*, Congress defined "telephone solicitation" in 47 U.S.C. § 227(a)(4) to include "the initiation of a telephone call or message." Though this separate section does not refer to "text messages," Congress' deliberate use of "telephone call or message" in a "neighboring provision"

---

[9] In actuality, the TCPA was designed to regulate several independent types of potential telemarketing concerns, including live voice solicitations (*see* 47 U.S.C. § 227(c)); artificial or pre-recorded voice messages (*see* § 227(b)(1)(B)); auto-dialing to telephones (*e.g.*, cell phones) where the subscriber is charged for the call (*see* § 227(b)(1)(A)(iii)); automated telemarketing to medical or emergency facilities (*see* § 227(b)(1)(A)(i)); the transmission of unsolicited faxes (*see* § 227(b)(1)(C)); and caller ID requirements (*see* § 227(e)). Texts are no different—they are a <u>distinct</u> form of technology raising distinct concerns and given <u>separate</u> statutory treatment by Congress.

[10] Furthermore, numerous courts (including courts in this Circuit) have found voice calls and texts differ "in several important ways" including that texts, unlike calls, "do[] not require that a person pick up a call, listen to a voice, or tie up their phone's line." *Fashion Nova*, 2026 WL 847568, at *3. *See also Stockdale,* 2026 WL 591842, at *4; *James*, 2026 WL 879244, at *3–5 (ruling similarly).

18

merely highlights that the term "telephone call" as used in Section 227(c) does <u>not</u> encompass all "messages." *Davis*, 797 F. Supp. 3d at 1274. *See also Radvansky*, 2026 WL 456919, at *4 ("construing these distinct phrases identically would render superfluous the different terms Congress chose to use in each subsection, a result which would violate the canon against surplusage"); *Irvin*, 2026 WL 1098403, at *4 (ruling similarly and declining to apply Section 227(a)(4) to 227(c)).

Moreover, the Supreme Court has long held that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Kucana v. Holder*, 558 U.S. 233, 249 (2010) (quoting *Nken v. Holder,* 556 U.S. 418, 430 (2009)). This undermines any argument text messages are "telephone calls" under the plain language of Section 227(c). Rather, Congress' omission of text messages from the scope of Section 227(c) was intentional and deliberate. *See also Davis*, 797 F. Supp. 3d at 1274 (noting that "Congress could reasonably conclude that unwanted telephone calls are more bothersome and intrusive than unwanted text messages, and it could provide broader protections against the former than the latter.")

*Third*, Congress has consistently drawn technology-specific distinctions within the TCPA. For example, although a fax transmission could be described colloquially as a "call" to the extent it is a communication transmitted by a telephone, Congress subjected fax advertisements to a separate regulatory scheme under Section 227(b), not Section 227(c), because faxes raise distinct concerns (*e.g*., the consumption of paper/toner). *See, e.g.*, *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737, 743 (6th Cir. 2013) (citing S. Rep. No. 102-178, at 4–5 (1991)). The same pattern appears throughout the TCPA's text, which differentiates among autodialed calls, prerecorded voice messages, live calls, and faxes, etc., each of which is assigned different statutory treatment. *See* fn.9, *supra*. *See also El-Sayed*, 2025 WL 2997759, at *2.

19

All this underscores that Congress understands the differences among types of communication technologies and has repeatedly drawn careful lines between them when legislating in this space. Why Congress purposefully chose not to include texts in the scope of Section 227(c) is beside the point and does not change the result the Court should reach in this case. Nor do courts have the power to rewrite Section 227(c) to account for technologies Congress intentionally did not regulate. *See, e.g., Jones*, 792 F. Supp. 3d at 901-02, at *4; *Fashion Nova*, 2026 WL 847568, at *4-5; *Shein*, 2026 WL 847584, at *4-5. In the end, "[w]hatever its reasoning, [Congress] clearly limited the private right [in Section 227(c)] to those receiving 'telephone calls.'" *Davis*, 797 F.Supp.3d at 1274. To hold otherwise would sweep in faxes and other types of communications governed by other provisions (or not at all, such as emails received on smart phones), and thus would improperly render large portions of the statute superfluous. *See Radvansky*, 2026 WL 456919, at *4.

Plaintiff also may refer to other regulations implemented by the FCC over a decade later that mention texts. This also fails. The FCC's authority to implement regulations under Section 227(c) was limited to "the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations" and *in the 9 months after December 20, 1991*. 47 U.S.C. §§ 227(c)(1) and (2). Those regulations were implemented in *1992*, as authorized, and also do not refer to text messages. *See* 47 C.F.R. § 64.1200(c). Therefore, any DNC regulations enacted thereafter exceeded the FCC's authority.

Further, while the FCC previously stated in 2003 that "calls" do include "text messages" in some circumstances, that only addressed texts in the context of the TCPA's automated calling provisions, which falls under a different statutory provision, *i.e.*, Section 227*(b)*. *See In re Rules & Regs. Implementing the TCPA*, 18 FCC Rcd. 14014, 14115–16 at ¶ 165, n.603–05 (2003); *see also Jones*, 792 F.Supp.3d at 900 ("[O]n its face…, the 2003 Order explicitly references only Section

227(b)"). Regardless, the FCC's prior interpretations are not entitled to deference today, under recent binding precedent. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025) ("the Hobbs Act does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of the relevant statute is correct"); *Loper*, 603 U.S. at 401 (overruling *Chevron* deference, finding "*Chevron* gravely erred [ ] in concluding that the inquiry is fundamentally different just because an administrative interpretation is in play"). This is true even though Section 227(c) afforded some limited rulemaking authority to the FCC. *See Radvansky*, 2026 WL 456919 at *4 ("this delegation did not authorize the FCC to determine that 'telephone call' includes text messages"); *Stockdale*, 2026 WL 591842, at *2 ("[R]ecent Supreme Court precedent dictates that this Court must independently—and without any special deference to an agency interpretation—determine the statute's meaning."). Rather, *McLauglin* only requires that courts give "'appropriate respect,' [to prior agency decisions] not 'appropriate deference.' [] And the concepts are different. One can provide 'appropriate respect' to an agency's view without adopting a statutory interpretation that conflicts with the ordinary public meaning of clear statutory text. Thus, even assuming the FCC['s] [2003] order clearly defined 'telephone calls' as that term is used in § 227(c)(5)"—and it does not—"'appropriate respect' for that conclusion would not require a different outcome here." *Davis*, 797 F.Supp.3d at 1275 (quoting *McLaughlin*, 606 U.S. at 168).

Plaintiff may also cite to other decisions interpreting whether a text is a "call" under Section 227(b), like the FCC did in its 2003 Order, to suggest that texts also qualify as a "telephone call" under Section 227(c). That would be unavailing. Federal statutory construction principles mandate that courts "must look to 'the language [of the statute] itself" and 'the specific context in which that language is used.'" *Reichert v. Kellogg Co.,* 170 F.4th 473, 480 (6th Cir. 2026) (quoting *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 431 (6th Cir. 2021)). In this regard, Sections

21

227(b) and (c) use the word "call" in different contexts. Indeed, "Section 227(b)(1)(A) [of the TCPA] deals with 'a broader prohibition on 'any call''" and not "the statutory term 'telephone call' at issue here" with respect to DNC claims under Section 227(c). *Davis*, 797 F. Supp. 3d at 1273. *See also James,* 2026 WL 879244, at *3-5 (noting that courts relaying on prior interpretations of Section 227(b) n this issue improperly focused on the the verb "call" used in Section 227(b) and also did not consider the definition of "telephone" whereas "[i]n Section 227(c)(5), 'call' is used as a noun").

At bottom, after *Loper*, *McKesson*, and *Facebook*, the law is clear that federal courts (i) need no longer blindly defer to the FCC's prior rulings on the TCPA and (ii) <u>must independently</u> interpret and apply the relevant TCPA provision at bar as written by Congress enacted it in 1991 as "if no agency were involved." *Loper*, 603 U.S. at 401. And courts must do so by applying ordinary statutory construction principles, without the influence of modern-day definitions and unconstrained by the FCC's interpretations, perceived gaps, or policy concerns. *See Stockdale*, 2026 WL 591842, at *2; *McGonigle*, 2026 WL 111338, at *2 (it is "crystal clear" that courts must resolve the question whether Section 227(c) covers texts "by applying the canons of construction, analyzing precedent, and looking to other persuasive court opinions, not by deferring to the [FCC's] interpretation").

Lastly, Plaintiff may also cite other decisions from courts that have ruled differently on this point. As the *Radvansky* court noted, though, "the reasoning underlying these decisions is inherently flawed" for many reasons and therefore should not be followed in this instance. 2026 WL 456919 at *4 (criticizing various cases on this issue). *See also Stockdale*, 2026 WL 591842, at *3 (same).[11]

---

[11] Indeed, as discussed in *Radvansky* and *Stockdale*, those courts that have erroneously found texts are covered by Section 227(c) either: (i) did not perform a proper statutory construction analysis consistent with recent Supreme Court rulings; (ii) gave considerable deference to the FCC's orders or opinions relating to Section 227(b) (a different section covering different phone technologies), in contravention of *Loper* and *McLaughlin*; (iii) relied heavily on modern dictionary definitions of "call" and "message" despite that Congress clearly did not intend to use the broadest possible construction of those terms; and/or (iv) did not interpret the statute as it existed in 1991, as the Supreme Court requires. This Court should not make the same analytical missteps here.

All told, although Plaintiff may believe that there are compelling reasons for the Court to expand Section 227(c) of the TCPA to reach the realities of today's communication technologies, only Congress can do so. Because text messages alone cannot support any Section 227(c) claim, Plaintiff's lone claim against CBP fails as a matter of law; and, since this is not a curable defect, her entire Complaint should thus be dismissed <u>with prejudice</u> on this basis. *See, e.g., Davis*, *supra*.

**B. Plaintiff Fails to Plead Sufficient Facts Supporting Key Elements of Her Claim.**

Plaintiff's Complaint should also be dismissed under Rule 12(b)(6) because she failed to plead sufficient non-conclusory facts supporting certain essential elements of her TCPA DNC claim.

*First*, the TCPA's implementing DNC regulations expressly prohibit initiating "telephone solicitations" to a "residential telephone subscriber ***who has registered his or her telephone number***" on the National DNC Registry. 47 C.F.R. § 64.1200(c)(2) (emphasis added). As other courts have found, a plain reading of the unambiguous language of this regulation requires Plaintiff here to plausibly allege that she registered ***her own*** phone number on which she allegedly received the subject communications on the National Registry to avoid a dismissal on this basis. *See, e.g., Rogers v. Assurance IQ, LLC*, 2023 WL 2646468, at \*5 (W.D. Wash. Mar. 27, 2023) (dismissing DNC claim in part for this reason); *Rombough v. Robert D. Smith Ins. Agency, Inc.,* 2022 WL 2713278, at \*2-4 (N.D. Iowa June 9, 2022) (thoroughly analyzing this issue, dismissing DNC claim *with prejudice* on this basis). That plain reading harmonizes it with the statutory language in which Congress authorized the creation of a registry of "***residential subscribers who object to receiving telephone solicitations***." 47 U.S.C. § 227(c)(3) (emphasis added). In this instance, however, Plaintiff does not indicate ***who*** registered the phone number upon which she received the at-issue communications, only that it "has been registered" on the Registry since May 2024. *See* Dkt. 1, ¶ 11. This inartful pleading suggests that Plaintiff's "number[] could have been registered by previous

owners of th[e] number[s] rather than by Plaintiff" herself, as the statute expressly states. *Rogers*, 2023 WL 2646468, at *4. Moreover, dismissal is particularly appropriate in this instance given that these "are facts that are easily within the knowledge" of Plaintiff and "can be pleaded to remove any doubt" about whether she actually registered her own number on the National DNC Registry. *Id*. Thus, Plaintiff's Complaint should be dismissed in its entirety on these additional grounds.

*Second*, Plaintiff must also properly plead facts suggesting her receipt of a "telephone solicitation" as defined by the TCPA's implementing DNC regulations. *See* 47 C.F.R. §§ 64.1200(c)(2) and (f)(15). However, a phone call is ***not*** a "telephone solicitation" by definition where it is made either with consent or pursuant to an "established business relationship" with the called party. 47 C.F.R. § 64.1200(f)(15)(i)-(ii); *see also* 47 C.F.R. § 64.1200(f)(5) (defining the term "established business relationship"). Here, while Plaintiff claims that she did not provide her consent (*see, e.g.,* Dkt. 1, ¶ 16), she says nothing about whether she had an established business relationship with the alleged caller(s) in this instance. This is also fatal to her DNC claim. *See Gillam v. Reliance First Capital, LLC,* 2023 WL 2163775, at *3-4 (E.D.N.Y. Feb. 22, 2023) (dismissing DNC claim on this basis where plaintiff alleged lack of consent but did not allege the lack of such a relationship). The entire Complaint should therefore be dismissed for this additional reason.

*Third*, Section 227(c) of the TCPA can only be invoked by a "residential telephone subscriber." 47 C.F.R. §§ 64.1200(c)(2) & (d). Accordingly, federal district courts in this Circuit and elsewhere have widely recognized that plaintiffs bringing DNC claims must allege sufficient non-conclusory facts showing number at which they received the calls is ***actually used*** for "residential" purposes, or they face dismissal. *See, e.g., Rogers,* 2023 WL 2646468, at *4; *Kemen v. Cincinnati Bell Tel. Co., Inc*., 2023 WL 361136, at *5 (S.D. Ohio Jan. 23, 2023).[12] Of course, parroting the

---

[12] *See also Cunningham v. McDonald,* 2018 WL 6737418, at *2 (M.D. Tenn. Nov. 5, 2018), *report and rec. adopted,* 2018 WL 6198417 (Nov. 28, 2018); *Cunningham v. Politi,* 2019 WL 2519568, at

statutory text or case law on this will not suffice to meet the *Iqbal*/*Twombly* plausibility threshold, either. *See, e.g., Morgan v. U.S. Xpress, Inc.,* 2018 WL 3580775, at *2 (W.D. Va. July 25, 2018) (dismissing similar claim applying only to "residential" lines, noting plaintiff's characterizations her number is a "residential" line "are not factual allegations, but legal terms drawn from the operative statute" and need not be accepted as true under 2(b)(6)); *Hicks*, 2020 WL 9261758, at *5 ("Plaintiff argues at length that cellular phone numbers are eligible for listing on the Do Not Call registry … but his argument never returns to the facts of *this* case or the use of his phone.") (emphasis original).[13]

Here, Plaintiff concludes, with zero factual enhancement, that the subject phone number is her "personal residential number" and is not used for "business or commercial purposes." Dkt. 1, ¶¶ 9, 10. Such bald allegations are insufficient to plead the essential "residential telephone subscriber" element of a DNC claim without more. *See, e.g., Rogers*, 2023 WL 2646468, at *4 (dismissing, holding alleged "personal" use of the subject number was insufficient, and noting that "[t]hese are facts that are easily within the knowledge of [p]laintiffs and can be pleaded to remove any doubt about … whether those numbers are for residential use"); *Hicks*, 2020 WL 9261758, at *5 (dismissing where plaintiff concluded his cell number was "not associated with a business and is for personal use"). This pleading defect further warrants dismissal of the entire Complaint.

## CONCLUSION

For all these reasons, this case should be referred to arbitration and stayed under the FAA, or alternatively the Complaint should be dismissed <u>with prejudice</u> under Rule 12(b)(6).

---

\*4 (E.D. Tex. 30, 2019), *report and rec. adopted,* 2019 WL 2524736 (June 19, 2019); *Hicks v. Alarm.com*, 2020 WL 9261758, at *5 (E.D. Va. Aug. 6, 2020); *Gillam,* 2023 WL 2163775, at *4.

[13] Federal courts have also held that whether someone qualifies as a "residential subscriber" for purposes of a TCPA DNC claim generally depends on certain conditions, including for example that the subject number that was called "is the ***primary means of reaching the individual at their residence***—that is, there is no other landline or phone at their residence which is instead the primary means of reaching them." *Mantha v. QuoteWizard.com, LLC*, 2022 WL 325722, at *6 (D. Mass. Feb. 3, 2022) (emphasis added). Plaintiff pleads no such facts here, either.

Dated: May 11, 2026

Respectfully Submitted,

By: /s/ Samuel F. Miller

Samuel F. Miller (TN BPR No. 022936)
Anna Kate Ferrell (TN BPR No. 042397)
**STITES & HARBISON, PLLC**
401 Commerce Street, Suite 800
Nashville, TN 37219
Phone: (615) 782-2200
Facsimile: (615) 782-2371
smiller@stites.com
akferrell@stites.com

John W. McGuinness (*pro hac vice* forthcoming)
A. Paul Heeringa (*pro hac vice* forthcoming)
 **MANATT, PHELPS & PHILLIPS, LLP**
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
JMcGuinness@manatt.com
PHeeringa@manatt.com

*Attorneys for Defendant*

26

**<u>CERTIFICATE OF CONFERRAL</u>**

The undersigned hereby certifies that, per LR 7.01(a)(1), counsel for Defendant conferred with counsel for Plaintiff on April 22, 2026, via email, regarding the foregoing motion to compel arbitration, at which time Plaintiff's counsel indicated Plaintiff's intent to oppose the motion.

<u>/s/ Samuel F. Miller</u>

Samuel F. Miller

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2026, I filed the foregoing Motion To Compel Arbitration Or, In The Alternative, To Dismiss Plaintiff's Complaint And Incorporated Memorandum Of Law In Support Thereof (including any attached exhibits) with the Clerk of Court for the United States District Court for the Middle District of Tennessee, through the Court's Electronic Case Filing System, which will automatically serve all counsel of record listed below:

Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street
Suite 2400
Hingham, MA 02043
617-485-0018
Fax: 508-318-8100
Email: anthony@paronichlaw.com

Carly M. Roman
Strauss Borrelli PLLC
980 N Michigan Ave.
Suite 1610
Chicago, IL 60611
872-263-1100
Fax: 872-263-1109
Email: croman@straussborrelli.com

James Gerard Stranch , IV
Stranch, Jennings & Garvey, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
615-254-8801
Fax: 615-250-3937
Email: gstranch@stranchlaw.com

By: /s/ Samuel F. Miller

Samuel F. Miller

28